**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

ALLEN AIKENS,

*Plaintiff,*

*v.*

COLLIER, et al.,

*Defendants.*
_________________________________/

Case No. 2:25-cv-13508

Matthew F. Leitman
United States District Judge

Patricia T. Morris
United States Magistrate Judge

**REPORT AND RECOMMENDATION TO DENY PLAINTIFF'S MOTIONS FOR PERMANENT INJUNCTION (ECF No. 3) AND FOR EXPEDITED INJUNCTION HEARING (ECF No. 59)**

## I. RECOMMENDATION

For the following reasons, **IT IS RECOMMENDED** that the Court **DENY** Plaintiff's motions for permanent injunction (ECF No. 3) and for an expedited hearing on that motion (ECF No. 59).[1]

[1] Pursuant to Local Rule 7.1(f)(1), hearings are not held on motions in civil cases when a party is incarcerated unless the assigned judge orders otherwise. E.D. Mich. 7.1(f)(1). The Undersigned finds no reason to depart from this rule and thus recommends that Plaintiff's motion for a hearing be denied.

# II. REPORT

## A. Background

### 1. Introduction

This is a *pro se* prisoner civil rights case. Plaintiff, a prisoner in the custody of the Michigan Department of Corrections (MDOC), has named dozens of Defendants, all of whom he alleges violated his constitutional rights in the wake of Defendant Collier sexually assaulting him in March 2023. (*See* ECF No. 1). In broad terms, Plaintiff alleges that after he reported the sexual assault, he began to face a slew of retaliatory acts. (*Id.* at PageID.1).

### 2. Procedural History

On November 4, 2025, Plaintiff filed the complaint (ECF No. 1), an application to proceed without prepaying fees or costs (ECF No. 2), and a motion for permanent injunction (ECF No. 3). Over the next several months, over 30 Defendants returned signed waivers of service (ECF Nos. 12–43), and had an attorney enter an appearance on their behalf (ECF No. 45).

On January 21, 2026, 29 Defendants jointly filed a motion for change of venue and to sever claims. (ECF No. 47). On March 2, 2026, following the completion of briefing, the Undersigned issued a report and recommendation (R&R) to deny the

motion. (ECF No. 53).[2] The R&R stated that if it was adopted, then "the Undersigned will turn to Plaintiff's motion for permanent injunction (ECF No. 3)." (*Id.* at PageID.279).

On April 14, Plaintiff filed a motion for an expedited injunction hearing related to his pending motion for permanent injunction. (ECF No. 59). Two days later, the District Court adopted the March 2 R&R. (ECF No. 60). Over the next few weeks, three more Defendants began participating in the case, with attorneys entering appearances on their behalf. (ECF Nos. 61–65).

On May 12, the Undersigned entered an order requiring all Defendants to respond to Plaintiff's pending motions for permanent injunction and an expedited injunction hearing. (ECF No. 67). Defendants employed by MDOC filed a joint response on June 10 (ECF No. 75) and Plaintiff filed his reply on June 29 (ECF No. 81). With briefing now complete, Plaintiff's motions are ready for consideration.[3]

### 3. Plaintiff's Allegations

Plaintiff alleges that Defendant Collier sexually assaulted him while he was housed at the Bellamy Creek Correctional Facility (IBC). (ECF No. 1, PageID.4, 11–12). Collier told Plaintiff that if he reported the sexual assault, Collier would

---

[2] A few days later, the Undersigned ordered the U.S. Marshals Service to effectuate service on five named Defendants who had yet to return signed waivers of service. (ECF No. 54).

[3] The Undersigned will consider the motions for summary judgment after briefing is complete.

write him a misconduct ticket for sexually assaulting staff, press criminal charges against him, and have him transferred to a level five prison. (*Id.* at PageID.12).

On March 30, 2023, Plaintiff went to Defendant Adam Coburn's office to give him eight pieces of outgoing legal mail. (*Id.*). After giving Coburn his mail, Plaintiff disclosed the sexual assault and requested that the Michigan State Police (MSP) be contacted to arrest Collier. (*Id.*). Coburn told Plaintiff that he would only call MSP if Plaintiff performed fellatio on him. (*Id.*). Plaintiff refused. (*Id.*). Coburn told Plaintiff that he was going to order Defendant Marcus Lemke to place Plaintiff in administrative segregation pending a class I misconduct ticket for threatening behavior. (*Id.*). Plaintiff left Coburn's office and reported what happened "to his assigned law library callout." (*Id.*).

The next day, Plaintiff attempted to give outgoing legal mail to Lemke. (*Id.* at PageID.13). Lemke refused to accept the mail. (*Id.*). Plaintiff then disclosed the sexual assault, to which Lemke responded, "'Nigger get the fuck out of my office.'" (*Id.*). As Plaintiff was walking away, he heard Lemke order Defendant Heileg to have Plaintiff placed in administrative segregation for demonstrating threatening behavior. (*Id.*).

Heileg, Defendant McBride, and two as of yet unidentified Defendants, participated in transferring Plaintiff to segregation. (*Id.*). While doing so, McBride told "Plaintiff that he ordered Defendant Donahue to destroy Plaintiff's legal,

religious, [and other] personal property for reporting Defendant Collier for rape." (*Id.*). McBride also told Plaintiff that Lemke was not going to call MSP to report the sexual assault and when Plaintiff asked McBride to call instead, McBride responded, "'we don't allow Niggers to get our officers arrested at [IBC].'" (*Id.*). When McBride and John Doe Defendants threw Plaintiff into the segregation cell, he hit his head, triggering a grand mal seizure for which he had to be taken to the hospital. (*Id.* at PageID.14).

A few days later, Defendant Ketchum warned Plaintiff that someone would poison his food for reporting Collier. (*Id.*). Plaintiff asked him who was saying such things and to call MSP to report the situation. (*Id.*). Ketchum refused, telling Plaintiff, "'I'm not losing my job for no Nigger!'" (*Id.*).

Around the same time, Plaintiff reported everything that had happened to him to Defendant Assistant Deputy Warden Brian Hadden. (*Id.* at PageID.14–15). Hadden did not help Plaintiff; he refused to take Plaintiff's grievances for processing and told him that he would order Defendant Brooke not to process any of Plaintiff's grievances in retaliation for reporting Collier. (*Id.* at PageID.15). Also around this time, Plaintiff asked Defendant Allen for help regarding the processing of his grievances. (*Id.*). Allen refused to help unless Plaintiff first performed a strip tease and masturbated for him. (*Id.*).

About a week and a half after Plaintiff first reported the sexual assault, Allen

slid a food tray through the door slot of Plaintiff's segregation cell. (*Id.*). Remembering Ketchum's warning, "Plaintiff examined his food tray and noticed crushed rat poison." (*Id.*). When Plaintiff informed Allen that his food had been poisoned and that he needed to call Defendant Warden Matthew Macauley about this incident, Allen responded that Plaintiff's food was poisoned because he reported Collier's sexual assault. (*Id.* at PageID.16).

A few days later, Defendant Eric Bullen came to Plaintiff's cell to provide him with mental health services. (*Id.*). Plaintiff disclosed the sexual assault to Bullen. (*Id.*). Bullen told Plaintiff that mental health services had been informed about his allegations of sexual assault and poisoning. (*Id.*). He also told Plaintiff that he, Defendant Dowdy, and Defendant Lisa Dean would be ordering Defendant Burnadette Roberts to begin the process of involuntarily sterilizing Plaintiff. (*Id.*). Bullen said this was the result of Plaintiff reporting Collier for rape and Allen for the rat poison. (*Id.*). Plaintiff asked Bullen to call MSP and give them a copy of his Prison Rape Elimination Act (PREA) grievance, but Bullen refused. (*Id.*).

On April 13, 2023, Roberts held a video hearing that resulted in her ordering Plaintiff to undergo sterilization injections for reporting Collier and Allen. (*Id.*). On April 19, Defendant Arrendonds, with Defendant Ramirez in attendance, interviewed Plaintiff about a PREA grievance he filed against Allen. (*Id.* at PageID.17). After the interview, Arrendonds told Plaintiff that she and Ramirez had

ordered Allen, Defendant Pratt, Defendant Piggott, and Defendant Grummet "to confiscate Plaintiff's legal, religious, [and other] personal property during a cell search for filing PREA grievances on Defendant Collier and Defendant Allen." (*Id.*). Later that day, Plaintiff attended a hearing with his advisor—one of the unidentified Defendants—which was paneled by three unidentified Defendants. (*Id.*). The panel ordered Plaintiff to undergo the process of involuntary sterilization due to his reports. (*Id.*).

Plaintiff returned to his cell after the hearing to find it "was trashed" during the search and that he was missing various religious and legal papers. (*Id.*). The following day, a nurse involuntarily injected Plaintiff with a drug to sterilize him. (*Id.*). The next month, Allen broke Plaintiff's television in retaliation. (*Id.* at PageID.18). Also around this time, Plaintiff told Defendant Athearn that the involuntary sterilization injections were retaliation for reporting Collier and continuing to pursue the matter. (*Id.*). Despite this, Athearn denied Plaintiff's request for discharge from the order requiring his sterilization. (*Id.*). Athearn informed Plaintiff that reporting Collier was the reason why the panel ordered him to be involuntarily sterilized. (*Id.*).

On May 23, non-party corrections officers moved Plaintiff to a new facility. (*Id.*). During the move to Carson City Correctional Facility (DRF), the officers told Plaintiff that Macauley and Defendant Wolczak ordered Allen to poison Plaintiff's

food back on April 9 in retaliation for reporting Collier. (*Id.*). The plan was to kill Plaintiff to prevent him from continuing to pursue the matter. (*Id.*). Later that day, Plaintiff requested to speak to a mental health provider "regarding a sexual assault by C/O Jay Block during an involuntary strip search." (*Id.*).

During the callout, non-party officials warned Plaintiff about Defendant Carla Monestere, unit chief for DRF's mental health services, and Defendant Nathaniel VanArnam, Plaintiff's assigned mental health case manager. (*Id.* at PageID.19). Defendant Warden Randee Rewerts, Roberts, and Defendant Jennifer Faha, director of MDOC's mental health services, ordered Monestere and VanArnam to continue Plaintiff's sterilization injections until Plaintiff's parole because he had reported Collier for rape. (*Id.*). The officials told Plaintiff that DRF's mental health providers would not act in Plaintiff's best interest nor help him. (*Id.*).

The same day, Plaintiff wrote separately to Monestere and VanArnam, requesting (1) the mailing address for where he needed to send his appeal of the involuntary sterilization order and (2) for the injections to be stopped. (*Id.*). He also informed both that the order had been entered in retaliation for reporting Collier for rape. (*Id.*). Nearly a year later, neither Monestere nor VanArnam had provided Plaintiff with the address despite Plaintiff grieving the matter. (*Id.* at PageID.19–20). Their actions prevented Plaintiff from appealing the sterilization order. (*Id.* at PageID.19). Plaintiff's attempts to file grievances against Monestere and VanArnam

were interfered with by Defendant Lisa Becher and Rewerts in retaliation for reporting Collier. (*Id.* at PageID.20).

At an October 4, 2023 hearing, Roberts informed Plaintiff that his sterilization injections would be continuing. (*Id.*). On January 2, 2024, Plaintiff mailed forms to Defendant Thompson wherein he requested (1) the address for where he needed to send his appeal of the sterilization order and (2) reported Becher's refusal to process his grievances. (*Id.* at PageID.20–21).

A few months later, on April 29, 2024, Plaintiff had a callout with Defendant Shauna Langston. (*Id.* at PageID.21). Langston asked Plaintiff about the involuntarily sterilization order and told Plaintiff that she knew it was retaliatory. (*Id.*). Plaintiff asked for Langston's help, but Langston responded by asking Plaintiff personal questions, including about the size of his penis. (*Id.*). Langston explained that she and her husband were in an open relationship and asked Plaintiff if he wanted a girlfriend. (*Id.* at PageID.22). Plaintiff responded that sexual relationships between prisoners and staff were illegal. (*Id.*). Langston then told Plaintiff that the only way he could get discharged from the involuntary sterilization order was by agreeing to be her boyfriend and engaging in group sex with her and Defendant Paul VanHeulen. (*Id.*). Plaintiff refused, and Langston responded that she would make sure he was never discharged from the involuntary sterilization order. (*Id.*). Plaintiff begged for Langston's help and told her about the side effects he was suffering from

the injections. (*Id.*).

Both Langston and VanHeulen made many sexual advances against Plaintiff from this point through July 15, 2025. (*Id.* at PageID.22–24). Plaintiff sent a letter to Warden Artis about Langston after the first incident in her office but never received a response. (*Id.* at PageID.23).

In May 2025, Plaintiff threatened to file grievances against Langston and VanHeulen and Langston responded that filing grievances was the reason for his involuntary sterilization order and him being labeled "mentally ill" in 2019. (*Id.* at PageID.24). Langston and VanHeulen informed Plaintiff that other Defendants had ordered them to continue his sterilization injections in retaliation for reporting Collier and Allen. (*Id.*). Langston and VanHeulen reiterated that they would only help Plaintiff if he agreed to engage in group sex with them. (*Id.*). Plaintiff again refused. (*Id.*). Shortly thereafter, Plaintiff wrote to Defendant Jones, Langston, and VanHeulen with requests related to his desire to appeal the involuntary sterilization order. (*Id.*). On June 17, Defendant Powell refused to provide Plaintiff with medical care, stating that she had been ordered not to treat Plaintiff by Langston and VanHeulen. (*Id.* at PageID.25–26).

Then on July 10, Defendant Lavigne, an assistant deputy warden, called Plaintiff to his office to deny his request for a step one grievance form against Langston and VanHeulen. (*Id.* at PageID.26). A few days later, Plaintiff was

transferred from the Thumb Correctional Facility (TCF) to Lakeland Correctional Facility (LCF) by order of Lavigne. (*Id.* at PageID.26–27). Plaintiff lost his prison job as a recreation worker because of the transfer, which was done in retaliation for his attempts to report Langston and VanHeulen for sexual harassment and retaliation. (*Id.* at PageID.26). In July 2025, Plaintiff learned that the previous month Langston had his dose of sterilization injections doubled for all future administrations. (*Id.* at PageID.27).

Plaintiff now brings the following seven counts:

| **COUNT** | **DEFENDANTS** | **NATURE OF CLAIMS** |
|---|---|---|
| **Count I** | Collier, Coburn, Lemke, Heileg, McBride, Donahue, Ketchum, Hadden, Brook, Allen, Bullen, Dean, Athearn, Roberts, Arrendonds, Ramirez, Grummet, Pratt, Piggott, Faha, Rewerts, VanArnam, Monestere, Becher, Langston, VanHeulen, Defendant David Dowdy, Stanifer, Brown, Powell, Lavigne, Jones, Thompson, Jenkins, Defendant Emmitt Richardson, Macauley, Wolczak, four unknown Defendants from the hearing, and two unknown Defendants who participated in the incident causing his seizure | Retaliation in violation of Plaintiff's First Amendment rights |
| **Count II** | VanArnam, Monestere, Thompson, VanHeulen, Jones, and Langston | Denial of access to the courts in violation of Plaintiff's First Amendment rights |

| | | |
|---|---|---|
| **Count III** | Arrendonds, Ramirez, Allen, Pratt, Piggott, Grummet, and Langston | Denial of freedom of religion in violation of Plaintiff's First Amendment rights |
| **Count IV** | Collier, Allen, Dowdy, Rewerts, Faha, Oean, Roberts, Bullen, VanArnam, Monestere, Stanifer, Brown, VanHeulen, Langston, Thompson, Athearn, Macauley, Wolczak, Powell, and numerous unknown Defendants | Cruel and unusual punishment in violation of Plaintiff's Eighth Amendment rights |
| **Count V** | McBride, Dowdy, Faha, Dean, Rewerts, Athearn, Roberts, Bullen, Monestere, Stanifer, VanHeulen, Langston, Thompson, and various unknown Defendants including the two who participated in the incident causing his seizure | Excessive force in violation of Plaintiff's Eighth Amendment rights |
| **Count VI** | Powell, Langston, Monestere, Roberts, VanHeulen, and several unknown Defendants | Deliberate indifference in violation of Plaintiff's Eighth Amendment rights |
| **Count VII**[4] | VanArnam, Thompson, Monestere, Jones, VanHeulen, and Langston | Violations of Plaintiff's Fourteenth Amendment due process rights |

### B. Legal Standard

Plaintiff's motion is styled as one for a permanent injunction, but since permanent injunctive relief is premature at this stage of the proceedings, "the Court

[4] Plaintiff mistakenly numbers this count VI instead of VII.

should construe [P]laintiff's motion as one for a preliminary injunction under Rule 65(a)." *Skinner v. Unknown Grandson*, No. 05-70556, 2006 WL 1997392, at *11 (E.D. Mich. July 14, 2006). When considering whether to grant a motion for a preliminary injunction, district courts consider the following four factors: "(1) the movant's likelihood of success on the merits; (2) irreparable injury to the movant; (3) substantial harm to others caused by the temporary order; and (4) the public interest." *Ne. Ohio Coal. for Homeless & Serv. Emp. Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006). "These four considerations are factors to be balanced, not prerequisites that must be met." *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (internal quotation marks and citation omitted). Preliminary injunctions are "extraordinary and drastic" remedies which are not awarded as of right. *Beckerich v. St. Elizabeth Med. Ctr.*, 563 F. Supp. 3d 633, 638 (E.D. Ky. 2021).

Despite this balancing approach, the likelihood of success factor tends to predominate. Thus, "a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000); *Michigan State AFL-CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997) ("While, as a general matter, none of these four factors are given controlling weight, a preliminary injunction issued where there is simply no likelihood of success on the merits must be reversed."). The proof required to obtain a preliminary

injunction is "much more stringent than the proof required to survive a summary judgment motion." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000).

**C. Analysis**

Plaintiff moves for an injunction to prevent him from becoming permanently blind while in MDOC custody and to remove documents that he alleges are false from his institutional record. (ECF No. 3, PageID.132). In his motion, Plaintiff recounts many of the factual allegations from his complaint. (*Id.* at PageID.135–36). Relevant to this motion, Plaintiff alleges that on April 20, 2023, while housed at IBC, he began receiving involuntary injections of the drug Fluphenazine.[5] (*Id.* at PageID.132, 135). Between starting the injections and October 30, 2025, Plaintiff informed MDOC staff that the injections were "causing Plaintiff temporary blindness and requested discontinuation" of the injections and discharge from involuntary services "due to the retaliatory intent" behind them. (*Id.* at PageID.135). Plaintiff's requests were denied, so he now seeks injunctive relief in the form of (1) a court order requiring MDOC Defendants to discharge Plaintiff from involuntary mental health services and (2) expungement from Plaintiff's institutional record of any documents containing diagnoses of mental illnesses including delusional

[5] Fluphenazine is an antipsychotic medication used to treat schizophrenia. "It works by balancing the level of dopamine in your brain, a substance that helps regulate mood, behavior, and thoughts." https://my.clevelandclinic.org/health/drugs/20298-fluphenazine-depot-injection (last visited July 1, 2026).

disorder. (*Id.* at PageID.135–36, 139).

Plaintiff's second motion specifies that he requests relief against Defendants Dowdy and Faha. (ECF No. 59). Faha is alleged to be the director of mental health services for MDOC. As such, Plaintiff's motion for injunctive relief is directed at MDOC's treatment of him across multiple facilities, rather than being directed at officials at specific facilities.

Plaintiff's request for injunctive relief is connected to his Eighth Amendment claim for excessive force. *Cf. Smith v. Dawdy*, No. 23-2043, 2024 WL 4925843, at *2 (6th Cir. Sept. 13, 2024) ("Specifically, Smith alleges that Dr. Melanie A. Clark, a treating psychiatrist, lied on numerous occasions concerning his symptoms; put deliberately false medical information in his file; and rendered diagnoses at odds with other medical evidence in order to subject Smith to involuntary mental-health treatment. On this reading of the complaint, Smith's claims sound in an excessive-force claim."). Thus, it is the likelihood of success on this claim that is relevant here.

The Sixth Circuit has acknowledged that while "the precise contours of the Eighth Amendment's prohibition on cruel and unusual punishments is not clear, [it] has entertained the possibility that a prisoner alleging facts similar to" those at issue here "could have a claim." *Id.* at *3. In *Thompson v. Bell*, the Sixth Circuit noted that the "logical inference from Supreme Court precedent is that subjecting a prisoner to involuntary medication when it is not absolutely necessary or medically

appropriate is contrary to the evolving standards of decency that underpin the Eighth Amendment." 580 F.3d 423, 440 (6th Cir. 2009) (citation modified). "[T]his is true notwithstanding the fact that a state *may*, in appropriate circumstances, involuntarily treat a prisoner following adequate process." *Smith*, 2024 WL 4925843, at *3 (emphasis added). The Sixth Circuit has also recognized that the allegations underlying these kinds of Eighth Amendment claims can also "raise due-process concerns, insofar as potentially false testimony and records could taint the process that [a plaintiff] received as part of the involuntary-treatment proceedings." *Id.*

What these Sixth Circuit cases suggest is that Plaintiff may have stated a valid Eighth Amendment claim, but that there is little guidance for the requirements of such a claim. This leaves Plaintiff facing a particularly steep uphill battle to establish he is likely to succeed on a claim that neither the Supreme Court nor Sixth Circuit have confirmed exists. However, Plaintiff's motions do not address his likelihood of success on the merits as to his excessive force claims. As such, Plaintiff has not established that he is likely to succeed on the merits.

As to the second factor, Plaintiff alleges that if the injections continue, he will become permanently blind. However, he does not submit evidence to support this allegation, and injunctive relief is not available for speculative harm. *See Sharp v. Cureton*, 319 F.3d 259, 272 (6th Cir. 2003) ("Injunctive relief should not issue where the claimed irreparable damage is speculative or may never occur."); *Gumpl v.*

*Seiter*, 687 F. Supp. 1212, 1213 (S.D. Ohio 1988) (explaining that speculative threat of injury is insufficient to support granting of injunctive relief). Thus, the second factor also weighs against injunctive relief.

The final two injunctive relief factors (*i.e.*, harm to others and public interest) will be considered together. Defendants have submitted evidence in the form of Plaintiff's medical records (ECF No. 75-1) that his involuntary mental health treatment is necessary for safety reasons. The psychiatrist who first recommended that Plaintiff be treated involuntarily noted: "He requires an [involuntary treatment order] to ensure medication compliance, as well as for safety, given his persistent paranoid delusional presentation." (ECF No. 75-1, PageID.548). While the Undersigned acknowledges that Plaintiff challenges the truthfulness of his medical records related to mental illness, he has not yet provided any evidence supporting this allegation. Moreover, "the interests of identifiable third parties and the public at large weigh against an injunction" in the prison setting. *Theriot v. Woods*, No. 2:18-CV-92, 2019 WL 409507, at *11 (W.D. Mich. Feb. 1, 2019). In light of the currently unrefuted evidence that Plaintiff's involuntary treatment is necessary for safety during his incarceration and the general principle of noninterference with prison administration, factors three and four weigh against injunctive relief.

In sum, the Undersigned suggests that all four factors weigh against the issuance of a preliminary injunction. Therefore, Plaintiff's motion for injunctive

relief should be denied.

### D. Conclusion

For these reasons, **IT IS RECOMMENDED** that the Court **DENY** Plaintiff's motions for permanent injunction (ECF No. 3) and for an expedited hearing on that motion (ECF No. 59).

## III. REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this R&R. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this R&R to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: July 7, 2026

s/ PATRICIA T. MORRIS
Patricia T. Morris
United States Magistrate Judge